## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ROBIN DENISE PHILLIPS, as Administratrix of the ESTATE OF TAMARQUIS ASHANTI PHILLIPS, | ) ) ) ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| NAPHCARE, INC., SARA M. REVELL, Warden of FCC Butner, *in her individal Capacity,* DONNA M. SMITH, SMITH, Warden of LSCI Butner, *in her individual capacity,* CYNTHIA SWAIN, Associate Warden of LSCI Butner, *in her individual capacity*, HENRY MCMILLAN, FCC Butner Health Services Administrator, *in his individual capacity,* SARA BEYER, Clinical Director of FCC Butner, *in her individual capacity* IVY MANNING, Director of Nursing at FCC Butner, *in her individual capacity,* KELLIE HARDEN, Quality Manager at FCC Butner, *in her individual capacity* , GURINDER SANDHU, *in his individual capacity,* MICHAEL VAN SICKLE, *in his individual capacity*, TERI PERKINSON, *in her individual capacity,* AMY JO ROSENTHAL, *in her individual capacity,* ANDREW E. STOCK, *in his individual capacity,* N. THOMPSON, *in her individual capacity,* MARY J. DENUZZIA, *in her individual capacity,* YVONNE LANE, *in her individual capacity,* CHRISTY BUNN, *in her individual capacity,* JOSEPH LEE HACKETT, *in his individual capacity,* ALNISSA SHAW, *in her individual capacity,* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |
| | ) | |

PLAINTIFF ROBIN DENISE PHILLIPS, as Administratrix of the ESTATE OF TAMARQUIS ASHANTI PHILLIPS, by and through her counsel, files this complaint against defendants United States of America, NaphCare, Inc., Sara M. Revell, Donna M. Smith, Cynthia Swain, Henry McMillan, Sara Beyer, Ivy Manning, Kellie Harden, Gurinder Sandhu, Michael Van Sickle, Teri Perkinson, Amy Jo Rosenthal, Andrew E. Stock, N. Thompson, Mary J. DeNuzzia, Yvonne Lane, Christy Bunn, Joseph Lee Hackett, and Alnissa Shaw, alleging as follows:

## NATURE OF ACTION

1. This lawsuit arises from the preventable death of Mr. Tamarquis Ashanti Phillips ("Mr. Phillips") while in custody at the Federal Correctional Complex in Butner, North Carolina ("FCC Butner").

2. Mr. Phillips had a severe seizure disorder that required him to take high doses of three different anti-epileptic drugs two times a day. Without these medications, he was at a high risk for suffering a serious, life-threatening seizure and, as a result, would be at a high risk of death.

3. Mr. Phillips condition was well-documented prior to his incarceration at FCC Butner. Indeed, Mr. Phillips was specifically ordered by The Honorable Judge Conrad of the Western District of North Carolina to serve his time at FCC Butner *because* of his seizure disorder and the high-level of medical care available at FCC Butner.

4. However, once in the custody of FCC Butner, and despite prior knowledge of his serious medical condition, Defendants failed to provide any medical care to Mr. Phillips during his incarceration. Defendants failed and refused to provide Mr. Phillips

2

with any of his medications during his incarceration at FCC Butner, medications that were required to prevent Mr. Phillips from suffering a serious seizure.

5.     As a direct result of their willful indifference to his serious medical needs—namely, the provision of medication to treat his well-documented seizure disorder—four days after his transfer to FCC Butner, Mr. Phillips suffered a severe seizure and died as a result.

6.     Plaintiff brings this action pursuant to 42 U.S.C. § 1983 and state tort law for Defendants' negligence, gross negligence and repeated violations of Ms. Phillips's Eighth and Fourteenth Amendment rights to the United States Constitution.

## PARTIES

7.     **Plaintiff Robin Denise Phillips** is the mother of Mr. Phillips and Administratrix of the **Estate of Tamarquis Ashanti Phillips**.  She is a citizen of Kings Mountain, North Carolina, in Cleveland County.  Her son's Estate was opened in Mecklenberg County.

8.     Mr. Phillips was born on September 8, 1978 in Gaston County, North Carolina.  He died on May 20, 2017, while in custody at the Federal Correctional Institution in Butner, North Carolina, which is located in Granville County.  Plaintiff opened Mr. Phillips' estate on January 26, 2018 in Mecklenberg County, where Mr. Phillips resided prior to his incarceration and was domiciled at the time of his death.  Mr. Phillips was a beloved and cherished family member, as the eldest son and grandson on both sides.

9.     **Defendant NaphCare, Inc.** ("Naphcare") is a private corporation that provides comprehensive healthcare services and staffing to correctional facilities

3

nationwide, including FCC Butner. Headquartered in Birmingham, Alabama, Defendant NaphCare is "devoted solely to providing correctional institutions with cost-effective, quality healthcare services." NaphCare provides onsite medical services, electronic health records administration, and offsite management services to, *inter alia*, several federal BOP correctional institutions. NaphCare has been contracting with the BOP for the provision of medical services at FCC Butner since 2012. In Fiscal Year 2017, it was projected that the contracts with Naphcare for provision of medical services to FCC Butner would be worth more than $100 million.

10. **Defendant Sara M. Revell** is the warden of FCC Butner. FCC Butner consists of four correctional facilities, including two medium security institutions, one Low Security Correctional Institution ("LCSI Butner"), and a Federal Medical Center ("FMC Butner"). Defendant Revell is sued in her individual capacity.

11. **Defendant Donna M. Smith** is the warden of LSCI Butner. Defendant Smith is sued in her individual capacity.

12. **Defendant Cynthia Swain** is the Associate Warden of FCC Butner. Defendant Swain was part of the review committee for Mr. Phillips' mortality review. She is sued in her individual capacity.

13. **Defendants Revell, Smith and Swain**, in their capacities as Wardens, are responsible for the day-to-day operations of FCC and LSCI Butner. They are aware of the policies and practices of the BOP, FCC Butner, and LSCI Butner regarding medical treatment of inmates and, more specifically, the administration of care and medication to inmates with known, serious medical needs.

4

14. **Defendant Sara Beyer** is a medical doctor and the Clinical Director of LSCI Butner, responsible for clinical care provided there. As a licensed provider, Defendant Beyer provides clinical oversight and is responsible for all health care delivered at FCC Butner. It is incumbent upon Defendant Beyer to consult with other health care providers to provide training and mentoring and to be directly involved with the evaluation and treatment of severely ill and medically complex patient care problems. Defendant Byer is responsible for, *inter alia*: reviewing applications and credentials for membership to the medical staff, interviewing prospective physicians and mid-level providers, implementing and monitoring in-house Continuing Professional Education (CPE) training, maintaining the quality of health records, supervising Medical Officers, and evaluating patient care through an ongoing quality assurance program that identifies problems and their resolution. Defendant Beyer was part of the review committee for Mr. Phillips' mortality review. Upon information and belief, at all relevant times, Defendant Beyer was employed by Defendant Naphcare. Defendant Beyer is sued in her individual capacity.

15. **Defendant Henry McMillan** is the Health Services Administrator at FCC Butner. Defendant McMillan, in collaboration with Defendant Beyer, manages and directs the activities of the health care professionals who are responsible for medical, dental, and allied health services (pharmacy, lab and x-ray services) to the inmate population at FCC Butner. This includes oversight of inpatient health care services, outpatient care in either an institution setting or at a local hospital, routine health maintenance services, emergency services and chronic care of inmates with long term illnesses. Defendant McMillan also serves as a cost center manager to prepare estimates and administer an annual budget,

manage a procurement system to provide adequate levels of medical, surgical, dental, and pharmaceutical supplies, and provide administrative supervision to subordinate staff (i.e., Mid-Level Practitioners, EMTs, Pharmacist, Clinical Nurses, Medical Record Technician, Dental Assistant, contract medical staff, etc.). In addition, Defendant McMillan is responsible for developing and coordinating internal review systems to assure compliance of the standards of the American Correctional Association (ACA) and The Joint Commission, as well as other regulatory groups and higher agency authorities. Defendant McMillan was part of the review committee for Mr. Phillips' mortality review. Defendant McMillan is sued in his individual capacity.

16. **Defendant Ivy Manning** is a registered nurse and Director of Nursing at FCC Butner. Defendant Manning is fully responsible for the Nursing Department at FCC Butner, including the Federal Medical Center located on Butner campus ("FMC Butner"). This responsibility includes providing guidance and direction in nursing technical expertise for the staff nurses, administration of the nursing units, and oversight of the nursing care provided to inmates in cooperation with the Nursing Supervisors. Defendant Manning's duties are both administrative and clinical. Defendant Manning was part of the review committee for Mr. Phillips' mortality review. Defendant Manning is sued in her individual capacity.

17. **Defendant Kellie Harden** is a Registered Nurse and the Quality Manager at FCC Butner. Defendant Harden was part of the review committee for Mr. Phillips' mortality review. Defendant Harden is sued in her individual capacity.

18.     **Defendant Gurinder Sandhu** is a Medical Doctor who provides medical care to inmates as an internal medicine doctor at FCC Butner.  Defendant Sandhu also has a private practice, Vanceboro Internal Medicine, PA, where he provides clinical internal medicine care.  Dr. Sandhu completed his training in internal medicine in 1996.  Dr. Sandhu was Mr. Phillips' physician during his incarceration at LSCI Butner. Dr. Sandhu is sued in his individual capacity.

19.     **Defendant Michael Van Sickle** is a Board-Certified Adult Nurse Practitioner (ANP-BC) at FCC Butner.  Defendant Van Sickle has been a nurse since November 2011 and a Nurse Practitioner since October 2016.  At FCC Butner, he is supervised by Dr. Andrew Edward Stock.  Defendant Van Sickle appears to have been the primary medical provider for Mr. Phillips during his incarceration. Defendant Van Sickle is sued in his individual capacity.

20.     **Defendant Teri Perkinson** is an Emergency Medical Technician and Paramedic (EMT-P) at FCC Butner.  Defendant Perkinson conducted Mr. Phillips' medical intake upon his entry into FCC Butner. Defendant Perkinson is sued in her individual capacity.

21.     **Defendant Amy Jo Rosenthal** is a Medical Doctor who is employed at FCC Butner, either by the BOP or by NaphCare. Dr. Rosenthal is a board-certified internal medicine doctor who has been practicing medicine since 1987.  Defendant Rosenthal was Mr. Phillips' attending physician during his incarceration at FCC Butner, although she states that she did not know he was at the prison. Defendant Rosenthal was part of the

7

review committee for Mr. Phillips' mortality review.  Defendant Rosenthal is sued in his individual capacity.

22.	**Defendant Andrew E. Stock** is a Medical Doctor who is employed at FCC Butner, either by the BOP or by NaphCare. Defendant Stock was first licensed as a medical doctor in North Carolina on July 21, 2006.  Defendant Stock is board-certified in family medicine.  Dr. Stock supervises Defendant Van Sickle.  Defendant Stock is sued in his individual capacity.

23.	**Defendant N. Thompson** is a Registered Nurse who is employed at FCC Butner, either by the BOP or by NaphCare. Defendant Thompson is sued in her individual capacity.

24.	**Defendant Mary J. DeNuzzia** is a Registered Nurse who is employed at FCC Butner, either by the BOP or by NaphCare.  Defendant DeNuzzia is sued in her individual capacity.

25.	**Defendant Yvonne Lane** is a pharmacist who is employed at FCC Butner, either by the BOP or by NaphCare.  Defendant Lane Defendant Lane is sued in her individual capacity.

26.	**Defendant Christy Bunn** is a Registered Nurse who is employed at FCC Butner, either by the BOP or by NaphCare.  Defendant Bunn has been a licensed registered nurse since October 17, 2000.  Defendant Bunn is sued in her individual capacity.

27.	**Defendant Joseph Lee Hackett** is a Registered Nurse who is employed at FCC Butner, either by the BOP or by NaphCare.  Defendant Hackett is sued in his individual capacity.

28. **Alnissa Shaw** is a Certified Physician's Assistant who is employed at FCC Butner, either by the BOP or by NaphCare. Defendant Shaw has been a licensed Physician's Assistant since May 20, 2005. Defendant Shaw is currently supervised by Michael Allen Heter, MD. Defendant Shaw is sued in her individual capacity.

## JURISDICTION AND VENUE

29. This action arises under the United States Constitution and federal law, particularly under the provisions of the Eighth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. §1983.

30. This action seeks redress for violations of the civil rights laws of the United States and jurisdiction is therefore invoked pursuant to 28 U.S.C. §§ 1331 & 1343.

31. Plaintiffs' claims arise from acts and omissions that occurred in Durham County, North Carolina and venue is proper under 28 U.S.C. §1391.

## FACTS

32. Tamarquis "Marcus" Ashanti Phillips was 38 years old at the time of his death on May 20, 2017. He suffered from a severe seizure disorder that manifested following a car accident in September 2012.

33. In 2013, Mr. Phillips participated in the distribution of crack cocaine. Despite his brief stint as a drug dealer, he did not use crack cocaine, or any other criminalized substance.

34. After November 2013, Mr. Phillips stopped dealing drugs and ceased criminal behavior. He started school to become a barber in 2014 and graduated in 2015.

In November 2015, he began an apprenticeship at the Grooming Lounge in Charlotte, North Carolina.

35. Following his car accident in 2012, Mr. Phillips regularly saw a neurologist for his seizure disorder. As of October 2016, he was prescribed three Anti-Epileptic Drugs ("AEDs"). Mr. Phillips took these medications properly and regularly. As a result of his proper and regular medication use, as of the time of his incarceration, Mr. Phillips had not suffered a seizure in over a year.

36. Mr. Phillips' medication regimen consisted of: (1) Depakote, 500 mg, delayed release, 2 tabs twice a day in the morning and at bedtime; (2) Keppra, 500 mg, one twice a day in the morning and at bedtime; and (3) Vimpat, 150 mg, two tablets twice a day in the morning and at night. These are each relatively high doses, indicative of the severity of his seizure disorder. Any reasonable medical provider should have noted the severity of his condition based on these medications.

37. On or about April 13, 2017, Mr. Phillips pled guilty in the District Court for the Western District of North Carolina to one charge of conspiracy to distribute and possess with intent to distribute cocaine base, conduct that had ended in 2013. He was sentenced to the United States Bureau of Prisons for a term of 144 months, followed by three years of probation.

38. The Court was aware that Mr. Phillips suffered from a severe seizure disorder requiring that he receive large dosages of three different medications to prevent a seizure. The Court weighed this factor heavily in making its recommendation to the BOP.

10

39. Upon sentencing, The Honorable District Judge Robert J. Conrad recommended to the BOP that Mr. Phillips be "placed in a facility as close to Charlotte, NC as possible, capable of providing him necessary medical treatment required by his medical conditions and indicated seizure issues, consistent with the needs of BOP."

40. He was ultimately assigned to FCC Butner, and specifically to LSCI Butner. FCC Butner provides in-house, on-site medical coverage and nurse staffing twenty-four hours day, seven days a week. Pursuant to its policies, physician coverage is provided by a hospitalist whenever staff physicians are not on-site, and inmates are to be evaluated for serious medical conditions as needed. Medical personnel fully staff the Health Services Unit at the prison seven days a week during normal working hours. Inmates can sign up to see a medical service provider for sick call days any weekday except Wednesday, and there is a protocol for the provision of emergency medical care if needed.

41. Pursuant to FCC Butner policy, medical screening is to be "conducted promptly on all new arrivals." This involves medical staff interview and visual assessment to identify any "acute or chronic medical problems and trauma." A medication reconciliation form is also completed as part of the intake process.

42. Pursuant to FCC Butner policy, pill lines "ensure medications are dispensed or administered to the inmate as recommended by the Health Care Provider during the scheduled times." Upon information and belief, FCC Butner has severely inadequate and grossly ineffective policies governing the administration of medication to inmates.

43. On May 1, 2016, Mr. Phillips was temporarily committed to the custody of the Mecklenburg Central Jail ("MCJ"), a jail facility overseen by the Mecklenburg County

11

Sheriff's Office, pending his transfer to FCI Butner. During his incarceration at MCJ, Mr. Phillips was administered all three of his medications regularly.

44. On May 16, 2017, Mr. Phillips was transferred from Mecklenburg Central Jail to the Low Security Correctional Institute (LSCI) in Butner.

45. Upon entry into the prison, at 3:41 p.m., he received a health screen, performed by Defendant Teri Perkinson, EMT-P. In his health screen, Defendant Perkinson noted a history of generalized absence seizures, greater than one per year, with adult onset. She noted that his last seizure had been seven to twelve months before. She further noted that Mr. Phillips' seizures had begun seven months after a car accident.

46. At 3:43 p.m. on May 16, Mr. Phillips was given a PPD test (tuberculosis screen), which was scheduled to be read by the nurse two days later. Later that afternoon, he was issued his eyeglasses. The screening tool indicated, "Instructed inmate how to obtain medical, dental and mental health care."

47. Mr. Phillips was also scheduled to have a "medication reconciliation" at 3:50 p.m. on the same day. Mr. Phillips' Medication Administration Record (MAR) from LSCI Butner starts on May 16, but it is completely empty. The MAR contains no medications and contains no indication that he was ever given any medication while at the facility.

48. Defendant Van Sickle, ANP-BC, met with Mr. Phillips at 3:25 p.m. on May 17. Defendant Van Sickle filled out a "Health Problems" form for Mr. Phillips, indicating an ICD-10 code of "G40909 – Epilepsy Seizure Disorder," a diagnosis that was current.

49. Defendant Van Sickle also wrote a new prescription for divalproex ER (generic for Depakote), 24-hour tab 500 mg, take two tablets, 1000 mg by mouth twice

12

daily for seizures, to start that day. However, that prescription never made it into Mr. Phillips' MAR, and there is no indication that the prescription was ever filled.

50. Defendant Van Sickle appears to have made the decision to discontinue two of Mr. Phillips' AED's without examining him or getting a history of his seizure disorder. He did not document any basis for his decision to do so. Abruptly discontinuing these medications put Mr. Phillips at great risk for generalized tonic-clonic seizures.

51. Despite repeated requests to the correctional officers and medical staff, Mr. Phillips received no additional treatment or any medications on May 18, 2017 or May 19, 2017. Although there is a notation on May 18, 2017 that indicated Mr. Phillips was to receive Divalproex ER 24 hour Tab 500 mg, Defendant Lane, the Pharmacy Provider, did not issue that medication to Mr. Phillips.

52. On May 19th, a friend of Mr. Phillips who was also incarcerated at LCSI Butner informed Mr. Phillips' fiancé that the two of them had gone to medical staff to request Mr. Phillips' medications.

53. Another fellow inmate stated that Mr. Phillips had been visibly and severely shaking on May 19th, and had informed the staff at LCSI Butner that he was not feeling well.

54. Several times during his incarceration, Mr. Phillips requested that he be provided all three of his AEDs from the staff administering medications. Each time they denied his requests. On May 19th, just before 11:00 p.m., Mr. Phillips informed his fiancé that he was very concerned about his health, as the medical staff would not give him his medications, despite his requests.

55. Around 1:00 a.m. on May 20, 2017, Mr. Phillips was seen going to the bathroom. A few hours later, at 9:58 a.m., Mr. Phillips was discovered face down, unresponsive, pulseless, cold, with locked muscles and blood on his pillow. Defendants initiated CPR in an attempt to resuscitate Mr. Phillips, but rescue efforts were unsuccessful. Due to the fact that he had not received any of his required medications or any other treatment, Mr. Phillips had a severe seizure that caused his death.

56. Within approximately thirty (30) minutes of being found, he was declared dead by the responding hospitalist, Gurinder Sandhu, M.D. Despite Mr. Phillips' known serious medical condition, this was the first time his doctor, Dr. Sandhu, saw him. Dr. Sandhu listed his cause of death as "cardiac arrest secondary to seizure disorder."

57. The Medical Examiner, Nicolas Litchfield, was notified of the death at 10:45 a.m.. Mr. Phillips' mother, Plaintiff Robin Phillips, was notified of her son's death at around 2:12 p.m. that afternoon. Given that Mr. Phillips was healthy just four days prior when he was transferred to FCC Butner, Plaintiff Robin Phillips requested an autopsy.

58. The autopsy concluded that Mr. Phillips' cause of death was a seizure disorder resulting from probable blunt force trauma (referring to the car accident that caused the seizure disorder). Nowhere in the autopsy or any other medical record is it indicated that cardiac arrest occurred.

59. It appears from the Medical Examiner's report that he was provided false information regarding the medications provided to Mr. Phillips during his incarceration, in an attempt to cover up the reckless failures to provide him with appropriate medical

treatment and medication. There is no documentation anywhere in the records that Mr. Phillips was ever given any of his medications while incarcerated at LSCI Butner.

60. The MAR does not list any medications for Mr. Phillips. Mr. Phillips attempted to obtain his seizure medications, but it appeared from the MAR that he was not been prescribed any medications. The MAR contains no indication that Mr. Phillips was offered these medications and either failed to appear to receive them or refused them. Indeed, had any such refusal occurred, it should have been documented in his medical records, as required by the standard of care and FCC Butner's own internal policies.

61. Postmortem toxicological analysis detected a subtherapeutic level of lacosamide (Vimpat) and no divalproex (Depakote) or levetiracetam (Keppra) on acidic, neutral and basis screens. No alcohol or common drugs of abuse were detected.

62. Defendant Dr. Sandhu conducted an "assessment" on May 20, 2017, which simply reads "inmate expired."

63. Defendant Perkinson wrote a memorandum on June 17, 2017, almost a month after his death, that tells a different story than the contemporaneous medical records, including her own notes.

64. In that memo, she states that she performed the intake screening on Mr. Phillips. She reported that he brought his medication with him, but she noted that "they were not medications I could give him for self carry." Since it was after 4:00 p.m., and staff had left for the day, she placed the medications that he brought and paperwork in the medication distribution room, purportedly so "the inmate could receive his evening and morning dosage until his provider was available to complete his medication reconciliation

15

the next morning." She states that she made a note of this on the 24-hour report and sent the intake to the provider for co-sign. She states that "Mr. Phillips did come to the pill line that evening and I administered his evening dosages." There is no indication that he received his medications that night in any contemporaneous record.

65.    On June 28, 2017, Defendant Smith submitted a Multi-Level Mortality Review ("MLMR") to the Office of Quality Management. She listed the nature of his death as "natural," and indicated that his admitting diagnosis was Epilepsy/Seizure Disorder resulting from a motor vehicle accident.

66.    The MLMR further indicated that Mr. Phillips underwent medication reconciliation with Divalproex 500 mg being prescribed twice a day for seizure disorder. The report does not assert that he was ever given this medication while at Butner, nor does it provide any explanation as to why his other two AEDs were discontinued. The MLMR states that he was scheduled for a history and physical examination May 24, 2017, eight days after his arrival at the facility. Of course, he never made it to that examination because he was not provided with any of his required medication in the meantime.

67.    Notably, on the MLMR, the attending physician, Defendant Rosenthal, made a note on her signature line indicating she had never seen the inmate and was not notified of his presence at the facility.

68.    Apparently, Mr. Phillips went at least three days and as much as four without any of his seizure medications and eventually suffered a fatal seizure. If Mr. Phillips ever received his medications on the evening of the May 16, there is no documentation of that.

16

69.     Vimpat is a Schedule V controlled substance, which cannot be distributed without accounting for the distribution. Accordingly, if Mr. Phillips had received Vimpat, it would be in the medical records.

70.     Defendant Van Sickle apparently unilaterally decided to abruptly discontinue two of his AEDs with no physical exam and no explanation for why he did it. Proper assessment and drug reconciliation was violated at this institution. There is no documentation of the providers attempting to administer his medications or of his either failing to show up for his medications or refusing them.

71.     Defendant Beyer, despite being Mr. Phillips' attending physician, admitted that she never saw or was even aware of Mr. Phillips during his incarceration. Defendant Sandhu, despite being assigned as his physician, never saw Mr. Phillips, conducted any physical examination of him or otherwise ensured he received appropriate medical care during his incarceration.  Indeed, no physician ever saw Mr. Phillips—an inmate with a severe medical condition who was sentenced to serve his time at FCC Butner because of the medical care available there—until after his death.

72.     The failure to provide Mr. Phillips with medical care or his medications proximately caused his death.  Without these medications, he was likely at high risk for a generalized tonic-clonic seizure that could be – and was– fatal.

73.     Mr. Phillips was a non-violent inmate who suffered a completely preventable, unnecessary death due to Defendants' reckless indifference to his serious medical needs.

## RULE 9(j) CERTIFICATION

74.     Plaintiff objects to the requirements of Rule 9(j) of the North Carolina Rules of Civil Procedure on the basis that this rule requires plaintiffs to prove their case without the benefit of discovery before factual discovery is even begun. This rule denies medical malpractice plaintiffs their rights of due process and equal protection under the law, of the right to open courts, and of the right to a jury trial (in violation of both the United States and North Carolina Constitutions).  Furthermore, Rule 9(j) is an unconstitutional violation of the following: (A) Amendment VII and Amendment XIV of the United States Constitution; and (B) Article I, Sections 18, 19 and 25 of the North Carolina Constitution. In addition, this complaint also alleges facts establishing breaches of common law duties for which certification of compliance with Rule 9(j) is not required. Such claims fall outside the requirements of Rule 9(j) of the North Carolina Rules of Civil Procedure and, as such, compliance with Rule 9(j) with respect to these claims is not required. Without waiving these objections, the attorneys for the plaintiffs provide the following information to comply with the requirements of Rule 9(j): Pursuant to Rule 9(j) of the North Carolina Rules of Civil Procedure, the medical care of the defendants and all medical records pertaining to the alleged negligence of the defendants that are available to the plaintiffs after reasonable inquiry have been reviewed before the filing of this Complaint by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the North Carolina Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care. In addition, should a court later determine that any of the persons who have reviewed the medical care of the defendants do not meet the

18

requirements of Rule 702(b) or 702(c) of the North Carolina Rules of Evidence, then plaintiff will seek to have such persons qualified as expert witnesses by motion under Rule 702(e) of the North Carolina Rules of Evidence, and plaintiff moves the court (as provided in Rule 9(j) of the North Carolina Rules of Civil Procedure) that such persons be qualified as expert witnesses under Rule 702(e) of the North Carolina Rules of Evidence. Furthermore, the requirements of Rule 9(j) are satisfied because the Complaint alleges facts establishing negligence under the existing common-law doctrine of *res ipsa loquitur*. Furthermore, the medical care and all medical records pertaining to the alleged negligence of the defendants that are available after reasonable inquiry have been reviewed before the filing of this complaint by a person reasonably expected to qualify as an expert witness under Rule 702(h) of the North Carolina Rules of Evidence and who is willing to testify that the appropriate standard of care as to administrative or other non-clinical issues was not met. Plaintiffs do not waive objections on the grounds stated to the purported certification requirements of Rule 9(j) by providing this certification, and specifically reserve objections to any "discovery" related to Rule 9(j).

**COUNT I**
**NEGLIGENCE**
**(Against All Defendants)**

75.     Paragraphs 1 through 74 are realleged as though fully set forth herein.

76.     NaphCare has been contracted by the United States Bureau of Prisons to provide medical care to inmates housed at FCC Butner.  The Individual Defendants, each of them, provide medical services to inmates at FCC Butner.

77. At all times relevant herein, NaphCare and the Individual Defendants had a duty to deliver medically necessary health care to inmates, including Mr. Phillips, in accordance with applicable standards of care.

78. NaphCare and the Individual Defendants breached this duty by failing to deliver to Mr. Phillips medically necessary care and by failing to comply with the applicable standards of care in treating Mr. Phillips. This includes failures to comply with the applicable standard of care for, *inter alia*: (1) the treatment of serious medical conditions, such as Mr. Phillips' seizure disorder, in a correctional facility, (2) medical intake and medication reconciliation for inmates entering a correctional facility, (3) medical record keeping in a correctional facility, including proper documentation of medications in the "Medication Administration Record," or MAR, and (4) the administration of prescribed medication in correctional facilities.

79. As a direct and proximate result of the negligence of NaphCare and the Individual Defendants as described herein, Tamarquis Phillips suffered during his incarceration and died within days of entering LSCI Butner. Substantial damages have been incurred and will continue to be incurred as a result of his death.

**COUNT II**
**WRONGFUL DEATH**
**(Against All Defendants)**

80. Paragraphs 1 through 79 are realleged as though fully set forth herein.

81. Robin Phillips is a parent of the Decedent. At the time of his death, Decedent was an unmarried resident of North Carolina with no children. Robin Phillips is a primary beneficiary in this action pursuant to N.C. Gen. Stat. § 28A-18-2(b).

82. As described above, the deliberately indifferent, careless, and negligent acts and/or omissions of the NaphCare and the Individual Defendants directly and proximately caused Mr. Phillips to suffer great physical pain and mental anguish, as he advanced painfully and avoidably toward his death.

83. Had Naphcare and the Individual Defendants conformed to requisite standards of care under these circumstances, Mr. Phillips' death and the injuries and damages alleged would have been avoided.

84. As a direct and proximate result of the deliberately indifferent and/or negligent acts and omissions of Naphcare and the Individual Defendants in causing Mr. Phillips' death, Robin Phillips sustained pecuniary loss, mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, attention, advice, counsel, training, and guidance.

85. As a direct and proximate result of the deliberately indifferent and/or negligent acts and omissions of Naphcare and the Individual Defendants in causing Mr. Phillips' death, the Estate of Tamarquis Phillips has incurred funeral and burial expenses.

86. As a direct and proximate result of their deliberately indifferent and/or negligent acts and omissions, the Estate of Tamarquis Phillips is entitled to recover from Naphcare and the Individual Defendants damages for the present monetary value of the deceased to his next of kin, including for the loss of the society, companionship, comfort guidance and advice of the deceased, as well as the loss of her income, services, protection, care and support. The decedent's beneficiaries are entitled to compensation for these

losses, and all other damages permitted under the wrongful death statute N.C. Gen. Stat. § 28A-18-2(b).

**COUNT III**
**CORPORATE NEGLIGENCE**
**(Against Defendant NaphCare)**

87.    Paragraphs 1 through 86 are realleged as though fully set forth herein.

88.    At all times relevant to this action, NaphCare and its nurses, physicians, employees, servants, agents and apparent agents who participated in Mr. Phillips' care while he was an inmate at FCC Butner from May 16, 2017, until May 20, 2017, were acting within the course and scope of their agency and/or employment and/or apparent agency with NaphCare.  Thus, NaphCare is liable for any and all acts or omissions of these nurses, physicians, employees, servants, agents and/or apparent agents.

89.    By way of further, additional and alternative pleading, and upon information and belief, NaphCare and its agents and employees were negligent in the care and treatment of Mr. Phillips in the following ways:

(a) They failed to administer Mr. Phillips' prescribed seizure medications;

(b) They failed to administer lacosamide (Vimpat) at 150 mg, two tablets twice a day morning and night;

(c) They failed to administer divalproex (Depakote) and levetiracetam (Keppra) as prescribed;

(d) They altered Mr. Phillips' seizure medication regimen without conducting a history and physical;

22

(e) The care provider responsible for altering Mr. Phillips' seizure medication regimen, Defendant Van Sickle, never examined and/or met Mr. Phillips prior to altering his seizure medication regimen;

(f) They failed to appreciate and provide appropriate treatment for Mr. Phillip's seizure disorder;

(g) They failed to conduct a sufficient medical intake and medication reconciliation given Mr. Phillips' history of a serious seizure disorder;

(h) They failed to appropriately document Mr. Phillips' Medication Administration Record ("MAR");

(i) They failed to ensure that Mr. Phillips, an inmate with a serious seizure disorder, received appropriate medical care;

(j) They failed to establish appropriate policies, procedures and guidelines for ensuring that inmates received prescribed medications;

(k) They failed to establish appropriate policies, procedures and guidelines for ensuring that an inmate like Mr. Phillips, with a serious seizure disorder, received clinical care upon admission;

(l) They failed to possess the degree of professional learning, skill and ability that others similarly situated ordinarily possess;

(m) They failed to comply with standards of practice among physicians with the same or similar training and experience and practicing in Durham County and/or Granville County, or similar counties, in May 2017;

(n) They failed to use best judgment and exercise reasonable care and diligence in the care and treatment of Mr. Phillips; and

(o) They were negligent in other ways to be disclosed in discovery which acts are incorporated herein as if fully set forth.

90. These duties are common law duties and, as such, did not involve the rendering or failure to render professional health care services, pharmacy services and/or medical services to Tamarquis Phillips and, accordingly, are not subject to the purported certification requirements of the North Carolina Rule of Civil Procedure 9(j).

91. As a direct and proximate result of the negligence of the United States of America as described herein, Tamarquis Phillips suffered during his incarceration and died within days of entering LSCI Butner. Substantial damages have been incurred and will continue to be incurred as a result of his death.

**<u>COUNT IV</u>**
**DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS IN**
**VIOLATION OF 42 U.S.C. § 1983**
**(Against All Defendants)**

92. Paragraphs 1 through 91 are realleged as though fully set forth herein.

93. As set out above, each of the Defendants acted with deliberate indifference to Mr. Phillips' known, serious medical needs, depriving Mr. Phillips of his constitutional rights to personal safety and protection under the Eighth and/or Fourteenth Amendment to the United States Constitution.

94. Each of the Defendants knew at the time of his or her acts and omissions that Mr. Phillips: (a) suffered from a serious medical condition— a severe seizure disorder; (b)

required high, twice-daily doses of three different medications (Vimpat, Depakote, and Keppra), which were necessary to control his seizure disorder and prevent seizures; (c) would be at great risk of suffering from sudden tonic-clonic seizures if not given the medication; (d) had repeatedly requested the medications; (e) was feeling physically ill as a result of not receiving his medications poor physical physical health issues as a result of not receiving his medications; and (f) was at risk of death if he did not receive proper medical attention, including administration of his medications.

95.     Despite knowing of Mr. Phillips' condition and the risks to his life, each of the Defendants failed to provide him any reasonable medical care at LSCI Butner or FMC Butner, and/or transport him to a hospital, where his medical needs could be met.

96.     As a direct and proximate result of the Defendants' deliberate indifference, Mr. Phillips died.

97.     Defendants NaphCare, Revell, Smith, Swain, McMillian, Beyer, Manning and Harden demonstrated deliberate indifference to the known medical needs of Mr. Phillips by failing to ensure that proper controls and/or protocols were in place to document and reconcile necessary medications, ensure the prompt medical assessment for serious medical conditions upon admission to FCC Butner, administer critical medications to inmates, monitor inmates with serious medical needs and provide inmates with appropriate treatment for medical conditions while housed at the FCC Butner.

98.     As a result of NaphCare, Revell, Smith, Swain, McMillian, Beyer, Manning and Harden's failures to implement and/or enforce appropriate controls and protocols for the care of inmates at FCC Butner, Mr. Phillips needlessly suffered and ultimately died.

99. Each of the Defendants was acting under color of state law at the time of his, her, or its deliberately indifferent acts and omissions and violated Mr. Phillips' constitutional rights under the Eighth and/or Fourteenth Amendment to the United States Constitution to adequate medical care while incarcerated.

## COUNT V
## GROSS NEGLIGENCE
### (Against All Defendants)

100. Paragraphs 1 through 114 are realleged as though fully set forth herein.

101. As set forth above, each of the Defendants acted with gross negligence as to Mr. Phillips' known, serious medical needs.

102. During Mr. Phillips' incarceration at FCC Butner, despite knowing of his severe seizure disorder, well-documented need for significant doses of AEDs, receiving requests from Mr. Phillips for his medication and witnessing clear signs of a worsening medical state, the Defendants took no steps to ensure that Mr. Phillips received appropriate, or any, medical attention or necessary medications.

103. Defendants repeatedly ignored Mr. Phillips' well-documented need for his AEDs, as well as requests by Mr. Phillips for these medications and medical attention.

104. Defendants Beyer and Sandhu, despite being physicians assigned to Mr. Phillips, never saw him during his incarceration. He was never seen by any physician, despite being an inmate with a serious medical condition, until after he had died.

105. Each of the Defendants refused to provide or assist Mr. Phillips in obtaining necessary medical care, including administration of his necessary medications, over the course of his detention and demonstrated gross negligence as to his serious medical needs.

26

106. As this conduct was widespread and occurred over the course of Mr. Phillips' incarceration at FCC Butner, it is apparent that this level of gross negligence as to the serious medical needs of inmates is a policy, custom, or practice of FCC Butner, NaphCare, Revell, Smith, Swain, McMillian, Beyer, Manning and Harden.

107. The conduct of each of the Defendants was grossly negligent as to Mr. Phillips' known medical needs, causing his suffering and death.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that this Court enter judgment against each Defendant, and grant:

A. Damages to the Estate of Tamarquis Phillips as compensation for all injuries and losses Tamarquis Phillips suffered which were caused by the negligent, grossly negligent and/or deliberately indifferent acts of the Defendants, without any negligence on the part of Plaintiff contributing thereto, jointly and severally, in an amount to be determined at trial;

B. Damages to Plaintiff Robin Phillips for the damages she was caused by the deliberate indifference, negligence and gross negligence of the Defendants, jointly and severally, in an amount to be determined at trial;

C. Punitive damages on all claims as allowed by law against the Defendants, in an amount to be determined at trial;

D. Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims as allowed by law; and

E.    Any further relief that this Court deems just and proper, and any other appropriate relief available at law and equity.

## REQUEST FOR A TRIAL BY JURY

Plaintiff requests a trial by jury.


Dated: November 21, 2018                Respectfully submitted,


__/s/ Catharine E. Edwards_____
Catharine E. Edwards
North Carolina Bar No. 52705
cedwards@edwardskirby.com

__/s/  Mary Kathryn Kurth_____
Mary Kathryn Kurth
North Carolina Bar No. 49461
mkurth@edwardskirby.com

**EDWARDS KIRBY, LLP**
3201 Glenwood Avenue, Suite 100
Raleigh, North Carolina 27612
Telephone:    (919) 780-5400
Facsimile:     (919) 800-3099