# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NORTH CAROLINA

_____

| | |
|---|---|
| ROBIN DENISE PHILLIPS, as Administratrix of the ESTATE OF TAMARQUIS ASHANTI PHILLIPS, <br>      Plaintiff, <br><br> v. <br><br> GURINDER SANDHU, *in his individual capacity,* VANCEBORO INTERNAL MEDICINE, P.A., TERI PERKINSON, *in her individual capacity,* YVONNE LANE, *in her individual capacity*, and UNITED STATES OF AMERICA, <br><br>      Defendants. | Case No. 5:21-ct-03099-M <br><br> **SECOND AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

_____

PLAINTIFF ROBIN DENISE PHILLIPS, as Administratrix of the ESTATE OF TAMARQUIS ASHANTI PHILLIPS, ("Plaintiff") by and through her counsel, files this complaint against Defendants Gurinder Sandhu, Vanceboro Internal Medicine, P.A., Teri Perkinson, Amy Jo Rosenthal, Yvonne Lane, and the United States of America alleging as follows:

## NATURE OF ACTION

1.     This lawsuit arises from the preventable death of Mr. Tamarquis Ashanti Phillips ("Mr. Phillips") while in custody at the Federal Correctional Complex in Butner, North Carolina ("FCC Butner").

2.     Mr. Phillips had a severe seizure disorder that required him to take high doses of three different anti-epileptic drugs two times a day. Without these medications, he was

at a high risk for suffering a serious, life-threatening seizure and, as a result, would be at a high risk of death.

3.     Mr. Phillips' condition was well-documented prior to his incarceration at FCC Butner, and Defendants had these records during his incarceration at FCC Butner. Indeed, Mr. Phillips was specifically ordered by The Honorable United States District Judge Conrad of the Western District of North Carolina to serve his time at FCC Butner *because* of his seizure disorder and the high level of medical care available at FCC Butner.

4.     However, once in the custody of FCC Butner, and despite prior knowledge of his serious medical condition, Defendants failed to provide *any* medical care to Mr. Phillips during his incarceration. Defendants failed and refused to provide Mr. Phillips with any of his medications during his incarceration at FCC Butner, medications that were required to prevent Mr. Phillips from suffering a serious and life-threatening seizure.

5.     As a direct result of their willful indifference to his serious medical needs – namely, the provision of medication to treat his well-documented seizure disorder – four days after his transfer to FCC Butner, Mr. Phillips suffered a severe seizure and died as a result.

6.     Plaintiff brings this action pursuant to *Bivens*, the federal analog to 42 U.S.C. § 1983, and state tort law for Defendants' negligence, gross negligence and repeated violations of Ms. Phillips's Eighth and Fourteenth Amendment rights to the United States Constitution.

7.     Plaintiff also commences this action pursuant to 28 U.S.C. §§ 2671–80, commonly referred to as the Federal Tort Claims Act ("FTCA"). The United States bears

2

liability for damages resulting from the Federal Defendants' negligence. Pursuant to 28 U.S.C. § 1346(b)(1), the United States of America is liable for all personal injuries and damages caused by the negligence, wrongful acts, or omissions of employees of the United States of America while acting within the scope of their employment. Further, 28 U.S.C. § 2674 provides that the United States be held equally as liable as a private individual whose negligent acts lead to injury.

## PARTIES

8.     **Plaintiff Robin Denise Phillips** is the mother of Mr. Phillips and Administratrix of the **Estate of Tamarquis Ashanti Phillips**. She is a citizen of Kings Mountain, North Carolina, in Cleveland County. Her son's Estate was opened in Mecklenburg County, North Carolina.

9.     Mr. Phillips was born on September 8, 1978, in Gaston County, North Carolina. He died on May 20, 2017, while in custody at the Federal Correctional Institution in Butner, North Carolina, which is located in Granville County. Plaintiff opened Mr. Phillips' estate on January 26, 2018, in Mecklenburg County, where Mr. Phillips resided prior to his incarceration and was domiciled at the time of his death. Mr. Phillips was a beloved and cherished family member, as the eldest son and grandson on both sides.

10.     **Defendant Gurinder Sandhu** is a Medical Doctor who provides medical care to inmates as a hospitalist at FCC Butner. Upon information and belief, at all relevant times, Defendant Sandhu was employed at FCC Butner as a medical contractor with the United States Bureau of Prisons ("BOP"). Defendant Sandhu also has a private practice, Vanceboro Internal Medicine, P.A., where he provides clinical internal medicine care.

3

Defendant Sandhu completed his training in internal medicine in 1996. Upon information and belief, at all times relevant to this action, Defendant Sandhu was board-certified in internal medicine and at the time of the events in question held himself out to be an expert in the field of internal medicine having special knowledge and skill possessed by internal medicine physicians in his locality with similar training and experience. Defendant Sandhu was Mr. Phillips' physician during his incarceration at LSCI Butner. Defendant Sandhu resides in Craven County, North Carolina, and is sued in his individual capacity.

11. **Vanceboro Internal Medicine, P.A.** ("Vanceboro") is a corporation duly organized according to and/or existing under and pursuant to the laws of the State of North Carolina with the purpose of conducting and carrying on the professional practice of medicine, specifically internal medicine. Its principal office and place of business is located in Craven County at 260 Highway 43 North, Vanceboro, NC 28586.

12. Upon information and belief, Defendant Sandhu, at all times relevant to this action, was acting as an employee and/or agent and/or apparent agent of Vanceboro and was acting within the course and scope of his employment and/or agency and/or apparent agency with Vanceboro while providing services and care to Mr. Phillips during his incarceration at LCSI Butner. Thus, Vanceboro is liable for any and all acts or omissions of Defendant Sandhu as described fully herein.

13. **Defendant Teri Perkinson** is an Emergency Medical Technician and Paramedic (EMT-P) at FCC Butner who, upon information and belief, at all relevant times was employed by the BOP. Defendant Perkinson conducted Mr. Phillips' medical intake

upon his entry to FCC Butner. Defendant Perkinson resides in Wake County, North Carolina, and is sued in her individual capacity.

14. **Defendant Yvonne Lane** is a Registered Nurse who, upon information and belief, at all relevant times was employed by the BOP. Defendant Lane resides in Franklin County, North Carolina, is sued in her individual capacity.

15. **Defendant United States of America**, by and through the BOP, is responsible for the administration of the federal prison system, including FCC Butner and each of its facilities, by and through the BOP, a United States federal law enforcement agency. FCC Butner consists of four correctional facilities, including two medium security institutions, one Low Security Correctional Institution ("LSCI Butner"), and a Federal Medical Center ("FMC Butner").

16. Defendant United States of America ("United States") employed the individuals responsible for Mr. Phillips's death and was responsible for providing medical care for inmates in its custody at the Federal Correctional Complex in Butner, North Carolina. Specifically, the Defendant United States was the employer of the following individuals:

      a.      James C. Holland, the complex warden of FCC Butner.

      b.      Sara M. Revell, the warden of FCC Butner;

      c.      Justin F. Andrews, a warden of FCC Butner;

      d.      Stephanie L. Hollembaek, a warden of FCC Butner;

      e.      Thomas B. Smith, a warden of FCC Butner;

      f.      Donna M. Smith, the warden of LSCI Butner;

g.      Cynthia Swain, Associate Warden of FCC Butner, who was part of the review committee for Mr. Phillips' mortality review;

h.      Sara Beyer, a Medical Doctor trained in family medicine and the Clinical Director of LSCI Butner, responsible for clinical care provided there and all health care delivered at FCC Butner—including duties to consult with other health care providers to provide training and mentoring, be directly involved with the evaluation and treatment of severely ill and medically complex patient care problems, review applications and credentials for membership to the medical staff, interviewing prospective physicians and mid-level providers, implement and monitor in-house Continuing Professional Education (CPE) training, maintain the quality of health records, supervise Medical Officers, and evaluate patient care through an ongoing quality assurance program that identifies problems and their resolution;

i.      Michael Van Sickle, a board-certified Adult Nurse Practitioner (ANP-BC), who was the primary medical provider for Mr. Phillips during his incarceration;

j.      Andrew E. Stock, a Medical Doctor board certified in family medicine who supervised Mr. Van Sickle;

6

k.    Amy Jo Rosenthal, a Medical Doctor at FCC Butner, who was Mr. Phillips' attending physician during his incarceration at FCC Butner and part of the review committee for Mr. Phillips' mortality review;

l.    Mary J. DeNuzzia, a Registered Nurse;

m.  Joseph Lee Hackett, a Registered Nurse;

n.  Defendants Lane and Perkinson.

<u>JURISDICTION AND VENUE</u>

17.    This action arises under the United States Constitution and federal law, particularly under the provisions of the Eighth and Fourteenth Amendments of the Constitution of the United States, *Bivens*, and 28 U.S.C. §§ 2671–80.

18.    This action seeks redress for violations of the civil rights laws of the United States and jurisdiction is therefore invoked pursuant to 28 U.S.C. §§ 1331 and 1343.

19.    The basis of jurisdiction is that all the acts complained of herein occurred within this judicial district.  Thus, venue is proper under 28 U.S.C. § 1391(b)(2).

**ADMINISTRATIVE EXHAUSTION**

20.    Plaintiff timely submitted her administrative FTCA claim to the BOP on June 20, 2019.  The claim was filed with the BOP within two (2) years of the date accrual, in accordance with 28 U.S.C. § 2401.

21.    A claim for wrongful death under the FTCA accrues on the date when both an injury and its cause are known. 28 U.S.C. § 2401(b).  Plaintiff was aware of the injury – her son's death – on May 20, 2017.  Plaintiff was not aware of the cause of his death, however, until the autopsy was released to her on August 30, 2017, and the death certificate

7

was amended on September 7, 2017, which indicate that he died from a seizure. Accordingly, Plaintiff's claims did not accrue until August 30, 2017.

22.     On December 30, 2019, the BOP issued a denial of Plaintiff's administrative claim, which was received by her counsel on January 10, 2020.

23.     Plaintiff exhausted all administrative remedies as required by 28 U.S.C. § 2675(a); therefore, this Court now has jurisdiction over all claims brought against Defendant United States of America pursuant to the FTCA.

<u>**FACTS**</u>

24.     Mr. Phillips was 38 years old at the time of his death on May 20, 2017. He suffered from a severe seizure disorder that manifested following a car accident in September 2012.

25.     In 2013, Mr. Phillips participated in the distribution of crack cocaine. Despite his brief stint as a drug dealer, he did not use crack cocaine, or any other criminalized substance.

26.     After November 2013, Mr. Phillips stopped dealing drugs and ceased criminal behavior. He started school to become a barber in 2014 and graduated in 2015. In November 2015, he began an apprenticeship at the Grooming Lounge in Charlotte, North Carolina.

27.     Following his car accident in 2012, Mr. Phillips regularly saw a neurologist for his seizure disorder. As of October 2016, he was prescribed three Anti-Epileptic Drugs ("AEDs"). Mr. Phillips took these medications properly and regularly, as it was imperative

for his own health and safety. As a result of his proper and regular medication use, as of the time of his incarceration, Mr. Phillips had not suffered a seizure in over a year.

28. Mr. Phillips' medication regimen consisted of: (1) Depakote, 500 mg, delayed release, two tablets twice a day in the morning and at bedtime; (2) Keppra, 500 mg, one tablet twice a day in the morning and at bedtime; and (3) Vimpat, 150 mg, two tablets twice a day in the morning and at night. These are each relatively high doses, indicative of the severity of his seizure disorder. Any reasonable medical provider should have noted the severity of his condition based on these medications, particularly when all three are prescribed at these high dosages.

29. Without these medications, Mr. Phillips would be at a very high risk for serious seizures and death. Moreover, it is medically well known and established that abruptly stopping *any* of these medications is incredibly dangerous. Depakote's warning label states: "The most important information about Depakote is: Do not stop taking Depakote without first talking to your healthcare provider. Stopping Depakote suddenly can cause serious problems." Keppra's Patient Medication Guide, inserted with the medication, states: "Antiepileptic drugs, including KEPPRA, should be withdrawn gradually to minimize the potential of increased seizure frequency." Vimpat's warning label states that the most important information about Vimpat is as follows:

> Do not stop taking VIMPAT without first talking to your healthcare provider. Stopping VIMPAT suddenly can cause serious problems. Stopping seizure medicine suddenly in a patient who has epilepsy can cause seizures that will not stop (status epilepticus).

30.     On or about April 13, 2017, Mr. Phillips pled guilty in the District Court for the Western District of North Carolina to one charge of conspiracy to distribute and possess with intent to distribute cocaine base, conduct that had ended in 2013. He was sentenced to the BOP for a term of 144 months, followed by three years of probation.

31.     The Court was aware that Mr. Phillips suffered from a severe seizure disorder requiring that he receive large dosages of three different medications to prevent a seizure. The Court weighed this factor heavily in making its recommendation to the BOP regarding Mr. Phillips's placement.

32.     Upon sentencing, The Honorable United States District Judge Robert J. Conrad recommended to the BOP that Mr. Phillips be "placed in a facility as close to Charlotte, NC, as possible, capable of providing him necessary medical treatment required by his medical conditions and indicated seizure issues, consistent with the needs of BOP."

33.     He was ultimately assigned to FCC Butner, and specifically to LSCI Butner. FCC Butner provides in-house, on-site medical coverage and nurse staffing 24 hours per day, seven days a week. Pursuant to its policies, physician coverage is provided by a hospitalist whenever staff physicians are not on-site, and inmates are to be evaluated for serious medical conditions as needed. Medical personnel fully staff the Health Services Unit at the prison seven days a week during normal working hours. Inmates can sign up to see a medical service provider for sick call days any weekday except Wednesday, and there is a protocol for the provision of emergency medical care, if needed.

34.     Pursuant to FCC Butner policy, medical screening is to be "conducted promptly on all new arrivals." This involves medical staff interview and visual assessment

10

to identify any "acute or chronic medical problems and trauma." A medication reconciliation form is also completed as part of the intake process.

35. Pursuant to FCC Butner policy, pill lines "ensure medications are dispensed or administered to the inmate as recommended by the Health Care Provider during the scheduled times." Upon information and belief, FCC Butner has severely inadequate and grossly ineffective policies governing the administration of medication to inmates.

36. On May 1, 2016, Mr. Phillips was temporarily committed to the custody of the Mecklenburg Central Jail ("MCJ"), a jail facility overseen by the Mecklenburg County Sheriff's Office, pending his transfer to FCI Butner. During his incarceration at MCJ, Mr. Phillips was administered all three of his medications regularly. The medication orders record was provided to FCC Butner upon Mr. Phillips's transfer.

37. On May 16, 2017, Mr. Phillips was transferred from MCJ to LSCI Butner.

38. Upon entry into LSCI, at 3:41 p.m., he received a health screen, performed by Defendant Perkinson. During his health screen, Defendant Perkinson noted a history of generalized absence seizures, greater than one per year, with adult onset. She noted that his last seizure had been seven to twelve months before. She further noted that Mr. Phillips' seizures had begun seven months after a car accident. She did not notate that he was taking medication for these seizures.

39. At 3:43 p.m. on May 16, Mr. Phillips was given a PPD test (tuberculosis screen), which was scheduled to be read by the nurse two days later. Later that afternoon, he was issued his eyeglasses. The screening tool indicated, "Instructed inmate how to obtain medical, dental and mental health care."

11

40.     Mr. Phillips was also scheduled to have a "medication reconciliation" at 3:50 p.m. on May 16, 2017, by a Physician – which would likely have been the doctor on call, Defendant Sandhu, or his attending doctor, Dr. Rosenthal – but neither doctor saw him and that never occurred.

41.     Mr. Phillips' Medication Administration Record (MAR) from LSCI Butner starts on May 16, but it is completely blank.  The MAR contains no medications and contains no indication that he was ever given any medication while at the facility.

42.     Defendant Perkinson did nothing to flag or otherwise elevate Mr. Phillips' medical care for his serious condition.  Defendant Perkinson, an EMT, was not qualified or capable of personally addressing Mr. Phillips' medical needs, although she would have been qualified to understand the excessive risk to his safety if his needs went unaddressed.  She disregarded the substantial and excessive risk of harm to Mr. Phillips, ignoring his immediate need for medication and medical care.

43.     Defendant Perkinson should have notified someone qualified to provide appropriate medical care to Mr. Phillips, but she received no training on how to handle such serious medical needs by Holland, Revell, Andrews, Hollembaek, Thomas B. Smith, Donna M. Smith or Swain, (collectively "Wardens"), by Dr. Sara Beyer or by Defendant United States of America.

44.     Mr. Van Sickle, ANP-BC, met with Mr. Phillips at 3:25 p.m. on May 17, 2017.  Mr. Van Sickle filled out a "Health Problems" form for Mr. Phillips, indicating an ICD-10 code of "G40909 – Epilepsy Seizure Disorder," a diagnosis that was current.

45.     Mr. Van Sickle also wrote a new prescription for divalproex ER (the generic for Depakote), 24-hour tab 500 mg, take two tablets, 1000 mg by mouth twice daily for seizures, to start that day.  However, that prescription never made it into Mr. Phillips' MAR, and it was never filled or dispensed.

46.     Mr. Van Sickle failed to prescribe the continuation of Vimpat or Keppra, Mr. Phillips' other two medications.  Mr. Van Sickle appears to have made the decision to discontinue two of Mr. Phillips' AED's without examining him or getting a history of his seizure disorder.  He did not document any basis for his decision to do so.  Abruptly discontinuing these medications put Mr. Phillips at great risk for life-threatening seizures.

47.     Dr. Stock, the doctor who supervises Mr. Van Sickle (a Nurse Practitioner) pursuant to N.C. Gen. Stat. § 90-18.2 and 21 NCAC 36.0802, did nothing to oversee this recklessly indifferent error—the abrupt stopping of two of Mr. Phillips' medications and the failure to input the prescription for his other medication into his MAR to be dispensed.

48.     Dr. Stock, through his legally-required supervision of Mr. Van Sickle, was aware of Mr. Phillips's serious medical condition and, through his medical training, knew the substantial risk created by abruptly stopping two of his required seizure medications. He disregarded this excessive risk, however, and took no steps to provide Mr. Phillips with his medication or the care that he required for his serious medical condition.

49.     Further, it is plain that Dr. Stock failed to properly train and oversee Mr. Van Sickle, including but not limited to his administration of medication and the dangers associated with abruptly ceasing seizure medications and/or significantly altering seizure medications without first examining the patient.

13

50.    Despite repeated requests to the correctional officers and medical staff, Mr. Phillips received no additional treatment or any medications on May 18, 2017, or May 19, 2017.  Ms. DeNuzzia, a Registered Nurse, read Mr. Phillips's PPD test on May 18, 2017, at 6:46 a.m.  Upon information and belief, Mr. Phillips requested his medication from Ms. DeNuzzia at this time but did not receive it.

51.    There is a notation on May 18, 2017, that indicated Mr. Phillips was to receive Divalproex ER 24-hour Tab 500 mg.  Defendant Lane, the pharmacy provider, however, did not dispense that medication to Mr. Phillips.  There is no record of why this prescribed medication was not dispensed to Mr. Phillips.  Notably, the national formulary for the BOP provides the following notation for Divalproex: "Warning, designated high risk Medication! Ensure appropriate medication, frequency, indication and monitoring."

52.    Unfortunately, Mr. Phillips was never able to obtain *any* of his medications, in spite of his many attempts to do so.  Several times during his incarceration, Mr. Phillips requested that he be provided all three of his AEDs from the staff administering medications.  Each time they denied his requests.

53.    On May 19, 2017, a friend of Mr. Phillips, who was also incarcerated at LCSI Butner, informed Mr. Phillips' fiancé that the two of them had gone to medical staff to request Mr. Phillips' medications.

54.    Another fellow inmate stated that Mr. Phillips had been visibly and severely shaking on May 19, 2017, and informed the staff at LCSI Butner that he was not feeling well.

14

55.     No strategy or policy was in place to ensure that inmates with severe medical conditions, such as Mr. Phillips, were appropriately triaged, treated, monitored and medicated. This created widespread problems at FCC Butner, in the provision of health care to inmates with serious medical conditions.

56.     Despite their knowledge of the substantial risk their insufficient policies created, Wardens, Dr. Beyer and Defendant United States of America wholly failed to create a system or method by which these high-risk inmates were treated on admission to the facility. Despite the substantial medical resources at their disposal, the Wardens, Dr. Beyer and Defendant United States of America failed to ensure inmates with severe medical conditions were properly treated.

57.     On May 19, 2017, just before 11:00 p.m., Mr. Phillips informed his fiancé that he was very concerned about his health, as the medical staff would not give him his medications, despite his repeated requests.

58.     Around 1:00 a.m. on May 20, 2017, Mr. Phillips was seen going to the bathroom. That was the last time he was seen alive.

59.     Nearly nine hours later, at 9:58 a.m., Mr. Phillips was discovered face down, unresponsive, pulseless, cold, with locked muscles and blood on his pillow. Defendant Perkinson, along with Joseph Lee Hackett and Christy Bunn (other RNs), initiated CPR in an attempt to resuscitate Mr. Phillips, but rescue efforts were unsuccessful. Because he had not received any of his required medications or any other medical treatment for the entirety of his incarceration, Mr. Phillips suffered a fatal seizure.

60.     Mr. Phillips was known to have a serious medical disorder that required monitoring and careful administration of medication.  At no time during his five-day incarceration was Mr. Phillips seen by any physician, including his assigned hospitalist, Defendant Sandhu, or his attending doctor, Dr. Rosenthal.  Notably, on the Multi-Level Mortality Review ("MLMR"), the attending physician, Dr. Rosenthal, made a note on her signature line indicating she had never seen the inmate and was not notified of his presence at the facility.

61.     Within approximately 30 minutes of being discovered unconscious in his cell, Mr. Phillips was declared dead by Defendant Sandhu, the responding hospitalist.  This was the first time any doctor saw Mr. Phillips at FCC Butner, and it was tragically too late.  Defendant Sandhu listed his cause of death as "cardiac arrest secondary to seizure disorder."  Defendant Sandhu's "assessment," conducted on May 20, 2017, simply reads "inmate expired."

62.     The Medical Examiner, Nicolas Litchfield, was notified of the death at 10:45 a.m.  Mr. Phillips' mother, Plaintiff Robin Phillips, was notified of her son's death later that afternoon, at around 2:12 p.m.  Given that Mr. Phillips was healthy just four days prior when he was transferred to FCC Butner, Plaintiff Robin Phillips requested an autopsy.

63.     The autopsy concluded that Mr. Phillips' cause of death was a seizure disorder resulting from probable blunt force trauma (referring to the car accident that originally caused the seizure disorder).  Nowhere in the autopsy or any other medical record is it indicated that cardiac arrest occurred, as Defendant Sandhu had inexplicably surmised.

16

64.     It appears from the Medical Examiner's report that he was provided false or misleading information regarding the medications administered to Mr. Phillips during his incarceration, in an attempt to cover up the repeated reckless failures by Defendants to provide appropriate medical care.  Mr. Litchfield was apparently told that Mr. Phillips "was prescribed Depakote, Vimpat, and Keppra while in prison for his seizure disorder" and that he "reportedly missed all three medications on 5/19/17."  There is no documentation, however, that Mr. Phillips was not prescribed Vimpat or Keppra during his imprisonment or that Mr. Phillips was never provided *any* of his medications the entire time he was incarcerated at LSCI Butner.

65.     It is inaccurate that Mr. Phillips simply "missed" his medications the day before his death—to the contrary, he was unable to obtain any of his medications at FCC Butner in the three or four days preceding his death despite repeated requests to defendants. The MAR does not list any medications for Mr. Phillips.  Mr. Phillips attempted to obtain his seizure medications, but the MAR did not reflect any prescribed medications.  The MAR contains no indication that Mr. Phillips was offered these medications and either failed to appear to receive them or refused them.  Indeed, had any such refusal occurred, it should have been documented in his medical records, as required by the standard of care and FCC Butner's own internal policies.

66.     Postmortem toxicological analysis detected a subtherapeutic level of lacosamide (Vimpat) and no divalproex (Depakote) or levetiracetam (Keppra) on acidic, neutral and basis screens.  No alcohol or common drugs of abuse were detected.

67.     Defendant Perkinson wrote a memorandum on June 17, 2017, almost a month after his death, that tells a different story than the contemporaneous medical records, including her own notes.

68.     In that memo, she states that she performed the intake screening on Mr. Phillips.  She reported that he brought his medication with him, but she noted that "they were not medications I could give him for self carry."   Defendant Perkinson's statement is contradicted by BOP medication classification, which indicates that Divalproex ER can be distributed as a self-carry medication.  It is evident that, despite her capacity and responsibility to do so, Defendant Perkinson did not permit Mr. Phillips access to this or either of this other seizure medications.

69.     Since it was after 4:00 p.m., and staff had left for the day, she placed the medications that he brought and paperwork in the medication distribution room, purportedly so "the inmate could receive his evening and morning dosage until his provider was available to complete his medication reconciliation the next morning."  She states that she made a note of this on the 24-hour report and sent the intake to the provider for co-sign.  This note is nowhere in the records.

70.     Defendant Perkinson also falsely states that "Mr. Phillips did come to the pill line that evening and I administered his evening dosages."  There is no indication that he received his medications that night in any contemporaneous record.

71.     Vimpat, for example, is a Schedule V controlled substance, which cannot be distributed without accounting for its distribution.   Accordingly, if Mr. Phillips had received Vimpat, it would be reflected in the medical records.

18

72.     Moreover, the Divalproex ER was not administered through the pill line, as it is classified as a self-carry medication.  Even that singular medication was, however, never distributed to Mr. Phillips for self-carry.

73.     On June 28, 2017, Donna M. Smith submitted a Multi-Level Mortality Review ("MLMR") to the Office of Quality Management.  She listed the nature of Mr. Phillips' death as "natural," and indicated that his admitting diagnosis was Epilepsy/Seizure Disorder resulting from a motor vehicle accident.  Immediately following the incident, Mr. Phillips' death was listed as "natural unexpected."

74.     The MLMR further indicated that Mr. Phillips underwent medication reconciliation with Divalproex 500 mg being prescribed twice a day for seizure disorder.  The report does not assert that he was ever given this medication while at FCC Butner, nor does it provide any explanation as to why his other two AEDs were discontinued abruptly.

75.     The following people signed off on Mr. Phillips's MLMR: (1) Cynthia Swain, as Associate Warden; (2) Dr. Sara Beyer, as Clinical Director; (3) Henry McMillan, as Health Services Administrator; (4) Kellie Harden, as Quality Manager; (5) Ivy Manning, as Director of Nursing; (6) Alnissa Shaw, as Reviewing Clinician; and (7) Dr. Amy Rosenthal, as Attending Physician.

76.     Moreover, medical staff members at FCC Butner routinely document false information on the medical records of inmates, particularly when inmates die in custody and a post-mortality review is required.  Indeed, four members of the staff at Butner were recently indicted for making false statements, because they had each -- independently and

19

in unrelated situations -- made false entries on forms indicating they had completed medical tasks when they had not.

77.     The practices and procedures at LCSI Butner, created by the Wardens, Dr. Beyer and Defendant United States of America, failed to ensure that inmates' serious medication needs were properly monitored and attended.  The practice in place did not allow for appropriate or immediate management of medications for inmates, including Mr. Phillips, whose health, safety and life depend on the administration of those medications.

78.     The MLMR states that he was scheduled for a history and physical examination May 24, 2017, eight days after his arrival at the facility.  Of course, he never made it to that examination because he was not provided with any of his required medication in the interim.  Apparently, Mr. Phillips went at least three or four days without any of his seizure medications and eventually suffered a fatal seizure.

79.     The failure to provide Mr. Phillips with medical care or his medications proximately caused his death.  Without these medications, he was likely at high risk for a generalized tonic-clonic seizure that could be – and was – fatal.

80.     Training of medical staff at LSCI Butner, conducted by Wardens, Dr. Beyer and Defendant United States of America, was woefully inadequate.  Defendants Lane and Perkinson, along with Mr. Van Sickle and other medical staff, lacked sufficient training regarding the intake and care of inmates with serious medical conditions, such as Mr. Phillips.  These failures to train include, but are not limited to: (1) appropriate identification of serious medical needs upon intake; (2) prompt, full examination of inmates with serious medical needs; (3) proper reconciliation of medications; (4) determination of when and

20

how to elevate an inmate's medical needs to a physician; (5) responsiveness to requests for medication by an inmate; and (6) documentation of essential medical information, such as prescriptions, medication administration, and medical conditions.

81.    Mr. Van Sickle apparently unilaterally decided to abruptly discontinue two of Mr. Phillips' AEDs with no physical exam and no explanation for why he did it.  Proper assessment and drug reconciliation practices were violated at this institution.  There is no documentation of the providers attempting to administer his medications or of his either failing to show up for his medications or refusing them.

82.    The practices and procedures at LCSI Butner, created by the Wardens, Dr. Beyer and Defendant United States of America, did not ensure inmates with serious medical conditions were attended by the appropriate medical staff.

83.    Dr. Rosenthal, despite being Mr. Phillips' attending physician, admitted that she never saw or was even aware of Mr. Phillips during his incarceration.  Defendant Sandhu, despite being assigned as his physician, never saw Mr. Phillips, conducted any physical examination of him or otherwise ensured he received appropriate medical care during his incarceration.  Indeed, no physician ever saw Mr. Phillips – an inmate with a severe medical condition who was sentenced to serve his time at FCC Butner because of the medical care available there – until after his death.

84.    Holland, Andrews, Hollembaek and Thomas B. Smith drafted the "Complex Supplement" that was created "to establish the procedures by which inmates may obtain medical or dental treatments with a minimum of time lost from their jobs, and simultaneously provide security safeguards and effective treatment."  These governing

21

policies provide that "[m]edical screening will be conducted promptly on all new arrivals," which includes an interview by medical staff, assessment for chronic medical problems and a medication reconciliation.

85.     The Complex Supplement regarding medical care further provides that general population inmates "without immediate medical needs will be scheduled for physical exam within 14 days of arrival." It does not provide any requirement or protocol, however, for the examination of general population inmates *with* immediate medical needs, such as Mr. Phillips.

86.     The policies established by Holland, Andrews, Hollembaek and Thomas B. Smith, as well as the other Wardens, were so inadequate as to constitute reckless indifference to the needs of inmates with serious medical conditions, such as Mr. Phillips.

87.     There had been a pattern and practice at FCC Butner of failure to provide necessary medical care to inmates with serious medical needs, resulting in serious injury and death to those inmates at an abnormally high rate. Butner was one of fourteen BOP prisons that, collectively, had an inordinately high death rate of 1.2 prisoners per month (per thousand prisoners) in an August 2016 review by the BOP. Additional institution-specific data is in the sole custody and control of the BOP and, despite the submission of several FOIA requests, Ms. Phillips has been unable to obtain such information, most recently because the BOP is experiencing delays in production of public records due to COVID-19.

88.     Mr. Phillips was a non-violent inmate who suffered a completely preventable, unnecessary death due to Defendants' reckless indifference to his serious medical needs.

## RULE 9(j) CERTIFICATION

89.     Plaintiff objects to the requirements of Rule 9(j) of the North Carolina Rules of Civil Procedure on the basis that this rule requires plaintiffs to prove their case without the benefit of discovery before factual discovery is even begun.  This rule denies medical malpractice plaintiffs their rights of due process and equal protection under the law, of the right to open courts, and of the right to a jury trial (in violation of both the United States and North Carolina Constitutions).  Furthermore, Rule 9(j) is an unconstitutional violation of the following: (A) Amendment VII and Amendment XIV of the United States Constitution; and (B) Article I, Sections 18, 19 and 25 of the North Carolina Constitution.  In addition, this complaint also alleges facts establishing breaches of common law duties for which certification of compliance with Rule 9(j) is not required.  Such claims fall outside the requirements of Rule 9(j) of the North Carolina Rules of Civil Procedure and, as such, compliance with Rule 9(j) with respect to these claims is not required.  Without waiving these objections, the attorneys for Plaintiff provide the following information to comply with the requirements of Rule 9(j): Pursuant to Rule 9(j) of the North Carolina Rules of Civil Procedure, the medical care of the Defendants and all medical records pertaining to the alleged negligence of the Defendants that are available to Plaintiff after reasonable inquiry have been reviewed before the filing of this Complaint by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the North Carolina

Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care. In addition, should a court later determine that any of the persons who have reviewed the medical care of the defendants do not meet the requirements of Rule 702(b) or 702(c) of the North Carolina Rules of Evidence, then Plaintiff will seek to have such persons qualified as expert witnesses by motion under Rule 702(e) of the North Carolina Rules of Evidence, and Plaintiff moves the court (as provided in Rule 9(j) of the North Carolina Rules of Civil Procedure) that such persons be qualified as expert witnesses under Rule 702(e) of the North Carolina Rules of Evidence. Furthermore, the requirements of Rule 9(j) are satisfied because the Complaint alleges facts establishing negligence under the existing common-law doctrine of *res ipsa loquitur*. Furthermore, the medical care and all medical records pertaining to the alleged negligence of the defendants that are available after reasonable inquiry have been reviewed before the filing of this complaint by a person reasonably expected to qualify as an expert witness under Rule 702(h) of the North Carolina Rules of Evidence and who is willing to testify that the appropriate standard of care as to administrative or other non-clinical issues was not met. Plaintiff does not waive objections on the grounds stated to the purported certification requirements of Rule 9(j) by providing this certification, and specifically reserve objections to any "discovery" related to Rule 9(j).

## COUNT I
### DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS
### IN VIOLATION OF *BIVENS*
### (Against Defendants Lane and Perkinson)

90.     Paragraphs 1 through 89 are realleged as though fully set forth herein.

91.     As set out above, Defendants Lane and Perkinson each acted with deliberate indifference to Mr. Phillips' known, serious medical needs, depriving Mr. Phillips of his constitutional rights to personal safety and protection under the Eighth and/or Fourteenth Amendment to the United States Constitution.

92.     Defendants Lane and Perkinson each knew at the time of her acts and omissions that Mr. Phillips: (a) suffered from a serious medical condition – a severe seizure disorder; (b) required high, twice-daily doses of three different medications (Vimpat, Depakote, and Keppra), which were all necessary to control his seizure disorder and prevent seizures; (c) would be at great risk of suffering from sudden tonic-clonic seizures if not given the medication; (d) had repeatedly requested the medications; (e) was feeling physically ill and experiencing declining health as a result of not receiving his medications; and (f) was at risk of death if he did not receive proper medical attention, including administration of his medications.

93.     Despite knowing of Mr. Phillips' condition and the risks to his life, Defendants Lane and Perkinson each failed to provide him any reasonable medical care at LSCI Butner or FMC Butner, and/or transport him to a hospital, where his medical needs could be met.

94.     Defendants Perkinson and Lane had actual knowledge of Mr. Phillips's serious medical condition, his seizure disorder, because they all had direct responsibility for and/or were involved in his clinical care. They knew this posed a substantial risk to his health and safety, but disregarded this risk. They knew that their acts and omissions –

wholesale failure to provide him his necessary medications or any care – were insufficient to mitigate the risks to his life.

95.     Mr. Phillips' condition was longstanding, as he had it for years prior to his incarceration and had it upon entry to the facility.  Mr. Phillips' condition was well-documented, by the judge in his criminal case, the transfer paperwork and every member of the medical staff that saw him at Butner.

96.     Defendants Lane and Perkinson were similarly aware that Mr. Phillips's medication was not being administered to him and, as medical professionals, were each aware of the serious risk that posed to Mr. Phillips.

97.     Defendants Lane and Perkinson each disregarded the substantial risk Mr. Phillips's health, safety and life.  Despite this knowledge, they each failed to remedy the issue or ensure that he received proper medical attention and/or his prescribed seizure medications.  They knew that their acts and omissions – wholesale failure to provide him his necessary medications or any care – were insufficient to mitigate the risks to his life. As such, they personally denied him necessary medical care for his serious medical need.

98.     As a direct and proximate result of the Defendants Lane and Perkinson's deliberate indifference, Mr. Phillips died.

99.     Defendants Lane and Perkinson were each acting under color of state law at the time of her deliberately indifferent acts and omissions and violated Mr. Phillips' constitutional rights under the Eighth and/or Fourteenth Amendment to the United States Constitution to adequate medical care while incarcerated.

100.   As a direct and proximate result of Defendants Lane and Perkinson's deliberate indifference to or reckless disregard for Mr. Phillips's life and rights, Mr. Phillips suffered serious physical injury, pain and suffering, mental anguish, consciousness of his own impending death, death and loss of future income.

101.   As a direct and proximate result of Defendants Lane and Perkinson's tortious conduct, the Estate of Tamarquis Ashanti Phillips suffered and will continue to suffer damages for the present monetary value of the deceased to his next of kin, including for the loss of the society, companionship, comfort guidance and advice of the deceased, as well as the loss of his income, services, protection, care and support.   Mr. Phillips's beneficiaries are entitled to compensation for these losses, and all other damages permitted under the wrongful death statute N.C. Gen. Stat. § 28A-18-2(b).

## COUNT II
## NEGLIGENCE
### (Against Defendants Sandhu and Vanceboro)

102.   Paragraphs 1 through 101 are realleged as though fully set forth herein.

103.   At all times relevant to this action, Defendant Sandhu was an employee, agent and/or apparent agent of Defendant Vanceboro, and was acting within the course and scope of that employment and/or agency. Thus, Defendant Vanceboro is liable for any and all negligent acts and omissions of Defendant Sandhu in his care and treatment of Mr. Phillips.

104.   As set forth above, Defendants Sandhu – the doctor assigned to oversee Mr. Phillips's care – and Defendant Vanceboro – Defendant Sandhu's medical practice – acted with negligence as to Mr. Phillips' known, serious medical needs.

27

105. During Mr. Phillips' incarceration at FCC Butner, despite knowledge of his severe seizure disorder, well-documented need for significant doses of AEDs, receiving requests from Mr. Phillips for his medication and witnessing clear signs of a worsening medical state, Defendant Sandhu took no steps to ensure that Mr. Phillips received appropriate, or any, medical attention or necessary medications.

106. Defendant Sandhu repeatedly ignored Mr. Phillips' well-documented need for his AEDs, as well as requests by Mr. Phillips for these medications and medical attention.

107. Defendant Sandhu, despite being a physician assigned to Mr. Phillips, never saw him during his incarceration. He was never seen by any physician, despite being an inmate with a serious medical condition, until after he had died.

108. Defendant Sandhu refused to provide or assist Mr. Phillips in obtaining necessary medical care, including administration of his necessary medications, over the course of his detention and demonstrated gross negligence as to his serious medical needs.

109. The conduct of Defendant Sandhu was negligent as to Mr. Phillips' known medical needs, causing his suffering and death.

110. Defendant Sandhu failed to identify, appropriately respond to and timely diagnose Mr. Phillips' severe seizure disorder.

111. Defendant Sandhu failed to take whatever steps were necessary to avoid subjecting Mr. Phillips to the risk of tonic-clonic seizures resulting from the failure to administer his medications.

112.	Defendant Sandhu failed to possess the degree of professional learning, skill and ability that others similarly situated ordinarily possess.

113.	Defendant Sandhu failed to comply with standards of practice among physicians and nurses with the same or similar training and experience practicing in Durham and/or Granville County or similar counties in May of 2017.

114.	Defendant Sandhu failed to use best judgment and exercise reasonable care and diligence in the care and treatment of Mr. Phillips.

115.	As a direct and proximate result of the negligence of Defendant Sandhu, as set forth herein and as imputed to Defendant Vanceboro, Mr. Phillips suffered serious physical injury, pain and suffering, mental anguish, consciousness of his own impending death, death and loss of future income.

116.	As a direct and proximate result of Defendants Sandhu and Vanceboro's tortious conduct, the Estate of Tamarquis Ashanti Phillips suffered and will continue to suffer damages for the present monetary value of the deceased to his next of kin, including for the loss of the society, companionship, comfort guidance and advice of the deceased, as well as the loss of his income, services, protection, care and support.  Mr. Phillips's beneficiaries are entitled to compensation for these losses, and all other damages permitted under the wrongful death statute N.C. Gen. Stat. § 28A-18-2(b).

**<u>COUNT III</u>**
**GROSS NEGLIGENCE**
**(Against Defendants Sandhu and Vanceboro)**

117.	Paragraphs 1 through 116 are realleged as though fully set forth herein.

118.    As set forth above, Defendants Sandhu and Vanceboro acted with gross negligence as to Mr. Phillips' known, serious medical needs.

119.    During Mr. Phillips' incarceration at FCC Butner, despite knowing of his severe seizure disorder, well-documented need for significant doses of AEDs, receiving requests from Mr. Phillips for his medication and witnessing clear signs of a worsening medical state, Defendants Sandhu and Vanceboro took no steps to ensure that Mr. Phillips received appropriate, or any, medical attention or necessary medications.

120.    Defendants Sandhu and Vanceboro repeatedly ignored Mr. Phillips' well-documented need for his AEDs, as well as requests by Mr. Phillips for these medications and medical attention.

121.    Defendant Sandhu, despite being a physician assigned to Mr. Phillips, never saw him during his incarceration. He was never seen by any physician, despite being an inmate with a serious medical condition, until after he had died.

122.    Defendants Sandhu and Vanceboro refused to provide or assist Mr. Phillips in obtaining necessary medical care, including administration of his necessary medications, over the course of his detention and demonstrated gross negligence as to his serious medical needs.

123.    As this conduct was widespread and occurred over the course of Mr. Phillips' incarceration at FCC Butner, it is apparent that this level of gross negligence as to the serious medical needs of inmates is a policy, custom, or practice of FCC Butner.

124.    The conduct of Defendants Sandhu and Vanceboro was grossly negligent as to Mr. Phillips' known medical needs, causing his suffering and death.

125.    As a direct and proximate result of Defendants Sandhu and Vanceboro's deliberate indifference to or reckless disregard for Mr. Phillips's life and rights, he suffered serious physical injury, pain and suffering, mental anguish, consciousness of his own impending death, death and loss of future income.

126.    As a direct and proximate result of Defendants Sandhu and Vanceboro's tortious conduct, the Estate of Tamarquis Ashanti Phillips suffered and will continue to suffer damages for the present monetary value of the deceased to his next of kin, including for the loss of the society, companionship, comfort guidance and advice of the deceased, as well as the loss of his income, services, protection, care and support.  Mr. Phillips's beneficiaries are entitled to compensation for these losses, and all other damages permitted under the wrongful death statute N.C. Gen. Stat. § 28A-18-2(b).

**COUNT IV**
**NEGLIGENCE**
**UNDER THE FEDERAL TORT CLAIMS ACT**
**(Against Defendant United States of America)**

127.    Paragraphs 1 through 126 are realleged as though fully set forth herein.

128.    The United States of America owns and operates FCC Butner to house inmates who are accused of or have been convicted of federal crimes.

129.    The United States of America employed the individual Defendants named in this matter, as well as Mr. Van Sickle.  The individual Defendants and Mr. Van Sickle negligently denied Mr. Phillips his three prescribed anti-seizure medications needed to control his serious and well-documented seizure disorder.  All of these individuals were

agents and/or employees of the United States of America and their negligent conduct is imputed to Defendant United States of America.

130. At all times relevant herein, the United States of America had a duty to confine inmates, including Mr. Phillips, in conditions that are safe, humane and secure. That includes a duty to deliver medically necessary health care to inmates, including Mr. Phillips, in accordance with applicable standards of care.

131. The United States of America, and its agents or employees, breached this duty by failing to deliver to Mr. Phillips medically necessary care and by failing to comply with the applicable standards of care in treating Mr. Phillips. This includes failures to comply with the applicable standard of care for, *inter alia*: (1) the treatment of serious medical conditions, such as Mr. Phillips' seizure disorder, in a correctional facility, (2) medical intake and medication reconciliation for inmates entering a correctional facility, (3) medical record keeping in a correctional facility, including proper documentation of medications in the "Medication Administration Record," or MAR, and (4) the administration of prescribed medication in correctional facilities.

132. As a direct and proximate result of the negligence of the United States of America, including its officers, agents and employees, as described herein, Mr. Phillips suffered serious physical injury, pain and suffering, mental anguish, consciousness of his own impending death, death and loss of future income.

133. As a direct and proximate result of the tortious conduct of Defendant United States of America, and its agents and employees, the Estate of Tamarquis Ashanti Phillips suffered and will continue to suffer damages for the present monetary value of the deceased

to his next of kin, including for the loss of the society, companionship, comfort guidance and advice of the deceased, as well as the loss of his income, services, protection, care and support. Mr. Phillips's beneficiaries are entitled to compensation for these losses, and all other damages permitted under the wrongful death statute N.C. Gen. Stat. § 28A-18-2(b).

**COUNT V**
**CORPORATE NEGLIGENCE**
**UNDER THE FEDERAL TORT CLAIMS ACT**
**(Against Defendant United States of America)**

134.    Paragraphs 1 through 133 are realleged as though fully set forth herein.

135.    At all times relevant to this action, the United States of America and its nurses, physicians, employees, servants, agents and apparent agents who participated in Mr. Phillips' care while he was an inmate at FCC Butner from May 16, 2017, until May 20, 2017, were acting within the course and scope of their agency and/or employment and/or apparent agency with the United States of America. Thus, the United States of America is liable for any and all acts or omissions of these nurses, physicians, employees, servants, agents and/or apparent agents.

136.    By way of further, additional and alternative pleading, and upon information and belief, the United States of America and its agents and employees were negligent in the care and treatment of Mr. Phillips in the following ways:

(a)    They failed to administer Mr. Phillips' prescribed seizure medications;

(b)    They failed to administer lacosamide (Vimpat) at 150 mg, two tablets twice a day morning and night;

33

(c)     They failed to administer divalproex (Depakote) and levetiracetam (Keppra) as prescribed;

(d)     They altered Mr. Phillips' seizure medication regimen without conducting a history and physical;

(e)     The care provider responsible for altering Mr. Phillips' seizure medication regimen, Mr. Van Sickle, never examined and/or met Mr. Phillips prior to altering his seizure medication regimen;

(f)     They failed to appreciate and provide appropriate treatment for Mr. Phillip's seizure disorder;

(g)     They failed to conduct a sufficient medical intake and medication reconciliation given Mr. Phillips' history of a serious seizure disorder;

(h)     They failed to appropriately document Mr. Phillips' MAR;

(i)     They failed to ensure that Mr. Phillips, an inmate with a serious seizure disorder, received appropriate medical care;

(j)     They failed to establish appropriate policies, procedures and guidelines for ensuring that inmates received prescribed medications;

(k)     They failed to establish appropriate policies, procedures and guidelines for ensuring that an inmate like Mr. Phillips, with a serious seizure disorder, received clinical care upon admission;

(l)     They failed to possess the degree of professional learning, skill and ability that others similarly situated ordinarily possess;

34

(m)  They failed to comply with standards of practice among physicians with the same or similar training and experience and practicing in Durham County and/or Granville County, or similar counties, in May 2017;

(n)  They failed to use best judgment and exercise reasonable care and diligence in the care and treatment of Mr. Phillips; and

(o)  They were negligent in other ways to be disclosed in discovery which acts are incorporated herein as if fully set forth.

137.  These duties are common law duties and, as such, did not involve the rendering or failure to render professional health care services, pharmacy services and/or medical services to Tamarquis Phillips and, accordingly, are not subject to the purported certification requirements of the North Carolina Rule of Civil Procedure 9(j).

138.  As a direct and proximate result of the negligence of the United States of America as described herein, Mr. Phillips suffered during his incarceration and died within days of entering LSCI Butner.  Substantial damages have been incurred and will continue to be incurred as a result of his death.

**COUNT VI**
**WRONGFUL DEATH**
**UNDER THE FEDERAL TORT CLAIMS ACT**
**(Against Defendant United States Of America)**

139.  Paragraphs 1 through 138 are realleged as though fully set forth herein.

35

140. Robin Phillips is a parent of Mr. Phillips. At the time of his death, Mr. Phillips was an unmarried resident of North Carolina with no children. Robin Phillips is a primary beneficiary in this action pursuant to N.C. Gen. Stat. § 28A-18-2(b).

141. As described above, the deliberately indifferent, careless, and negligent acts and/or omissions of the United States of America directly and proximately caused Mr. Phillips to suffer great physical pain and mental anguish, as he advanced painfully and avoidably toward his death.

142. Had the United States of America, and its agents and employees, conformed to requisite standards of care under these circumstances, Mr. Phillips' death and the injuries and damages alleged would have been avoided.

143. As a direct and proximate result of the deliberately indifferent and/or negligent acts and omissions of the United States of America, and its agents and employees, in causing Mr. Phillips' death, the Estate of Tamarquis Phillips has incurred funeral and burial expenses.

144. As a direct and proximate result of the deliberately indifferent and/or negligent acts and omissions of United States of America, and its agents and employees, in causing Mr. Phillips' death, Plaintiff sustained pecuniary loss, mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, attention, advice, counsel, training, and guidance.

145. As a direct and proximate result of their deliberately indifferent and/or negligent acts and omissions of its agents and employees, the Estate of Tamarquis Phillips is entitled to recover from the United States of America damages for the present monetary

value of the deceased to his next of kin, including for the loss of the society, companionship, comfort guidance and advice of the deceased, as well as the loss of her income, services, protection, care and support. Mr. Phillips' beneficiaries are entitled to compensation for these losses, and all other damages permitted under the wrongful death statute N.C. Gen. Stat. § 28A-18-2(b).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that this Court enter judgment against each Defendant, and grant:

A.   Damages to the Estate of Tamarquis Phillips as compensation for all injuries and losses Mr. Phillips suffered which were caused by the negligent, grossly negligent and/or deliberately indifferent acts of the Defendants, without any negligence on the part of Mr. Phillips or Plaintiff contributing thereto, jointly and severally, in an amount to be determined at trial;

B.   Damages to Plaintiff for the damages she was caused by the deliberate indifference, negligence and gross negligence of the Defendants, jointly and severally, in an amount to be determined at trial;

C.   Punitive damages on all claims as allowed by law against the Defendants, in an amount to be determined at trial;

D.   Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims as allowed by law; and

E.   Any further relief that this Court deems just and proper, and any other appropriate relief available at law and equity.

37

## <u>REQUEST FOR A TRIAL BY JURY</u>

Plaintiff requests a trial by jury.

Dated: January 10, 2022

Respectfully submitted,

<u>/s/ Catharine E. Edwards </u>
Catharine E. Edwards
N.C. State Bar No. 52705
Edwards Beightol, LLC
P.O. Box 6759
Raleigh, NC 27628
cee@eblaw.com
Phone: (919) 636-5100

<u>/s/ Kristen L. Beightol </u>
Kristen L. Beightol
N.C. State Bar No. 27709
Edwards Beightol, LLC
P.O. Box 6759
Raleigh, NC 27628
klb@eblaw.com
Phone: (919) 636-5100

*Attorneys for Plaintiff Robin Phillips*

38

## CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2022, I electronically filed on behalf of the Plaintiff the foregoing Second Amended Complaint with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties and/or their attorneys who have appeared in this action. I will also serve each Defendant through his or her counsel and the United States in accordance with Fed. R. Civ. P. 4(i).

This the 10th day of January, 2022.

/s/ Catharine E. Edwards
Catharine E. Edwards
N.C. State Bar No. 52705
Edwards Beightol, LLC
P.O. Box 6759
Raleigh, NC 27628
cee@eblaw.com
Phone: (919) 636-5100